Steven Ryan Caprio

16178 Montgomery Ave.,

Fontana, CA 92336

909.244.2079

Plaintiff in Pro Per

FILED

CLERK, U.S. DISTRICT COURT

12/25/2025

CENTRAL DISTRICT OF CALIFORNIA

BY _____AP_____ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

FEE PAID

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Eastern Division)

| | |
|---|---|
| STEVE CAPRIO, *Pro Se* | Case No.: 5:25-cv-03552-CV(AJR) |
| Plaintiff, | |
| v. | |
| | Civil Rights |
| JEAN DIANE ZEPEDA, LCSW, | 42 U.S.C. § 1983 |
| a/k/a/ JEANY GLASGOW, in her official | Fourth & Fourteenth |
| capacity; | Amendments; Monell |
| | |
| SAL ARREDONDO, SSP, individually and in | JURY TRIAL |
| his official capacity; | DEMANDED |
| | |
| SAN BERNARDINO COUNTY; | Reservation of right to |
| | amend, Fed. R. Civ. P. 15 |
| DOES 1–10, | |
| Defendants. | |

# TABLE OF CONTENTS

**I. Introductory statement** ..................................................................3

**II. Jurisdiction and Legal Authority** ......................................................3

**III. Venue** ...............................................................................3

**IV. Parties** ............................................................................. 4

**V. Statement of Facts**

   **A. Unreasonable Seizure: Warrantless Child Removal** .................................. 5

   **B. The Documents Presented at Removal** .............................................. 6

   **C. Parentage, Notice, & Misclassification** ........................................... 8

   **D. Child Abuse Central Index Listing** ................................................ 9

   **E. Conflicting Detention Report & Petition** .........................................10

   **F. Pre-Written Court Findings & Orders** ............................................ 12

   **G. Conflicting Removal & Placement** ............................................... 13

   **H. Plaintiff's History in Detention Report** ...........................................14

   **I. 10-Day Open Referral / Prior to Removal** ........................................ 15

   **J. Damages** ....................................................................... 20

**VI. Claims**

   **Count I: § 1983 - Fourth Amendment (Unlawful Seizure)** ............................ 20

   **Count II: § 1983 - Fourteenth Amendment (Procedural Due Process)** ........ 24

   **Count III: § 1983 - Fourteenth Amendment (Substantive Due Process)** ...... 29

   **Count IV: § 1983 - Fourteenth Amendment (Fabrication / Deception)** ........ 34

   **Count V: § 1983 - Municipal Liability (Monell)** ................................. 41

**VII. Prayer For Relief** ................................................................ 45

**VIII. Jury Demand & Reservation of Right to Amend** ................................. 47

**IX. Exhibit Index**

**X. Declaration in Support of Exhibits and Exhibits**

# I. INTRODUCTORY STATEMENT

1.      This action is brought under 42 U.S.C. § 1983 arising from San Bernardino County Children and Family Services' October 15, 2025 seizure and removal of Plaintiff's minor child (identified by initials, S.R.W-C.) from Plaintiff's custody. Plaintiff alleges that CFS employees, acting under color of state law, removed the child without pre-seizure judicial authorization or articulable exigent circumstances, without constitutionally adequate notice or procedures, and based on a facially defective detention document and conflicting post-seizure filings; Plaintiff also alleges an unlawful CACI listing. Plaintiff asserts Fourth Amendment and Fourteenth Amendment (procedural and substantive) claims and Monell municipal liability, and seeks damages, as described in his Prayer for Relief.

# II. JURISDICTION

2.      Jurisdiction is conferred by 28 U.S.C. §§ 1331 and 1343(a)(3) because this action arises under the Constitution and laws of the United States and seeks damages and equitable relief for deprivation of constitutional rights under color of state law. 42 U.S.C. § 1983.

# III. VENUE

3.      Venue is proper in the United States District Court for the Central District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred in San Bernardino County. Intradistrict assignment to the Eastern Division is appropriate because San Bernardino County lies within the Eastern Division of this District.

## IV. PARTIES

4.    **Plaintiff STEVEN RYAN CAPRIO** ("Plaintiff") is an individual and resident of Fontana, San Bernardino County, California. Plaintiff is the biological and adjudicated legal father of the minor child S.R.W-C. At all relevant times, Plaintiff was a custodial parent, and S.R.W-C. resided primarily with Plaintiff during the two years immediately preceding the events alleged herein. The child was removed from Plaintiff's home on October 15, 2025.

5.    **Defendant JEAN DIANE ZEPEDA, LCSW** ("Zepeda"), also known as Jeany Glasgow, is employed by San Bernardino County as Director of Human Services and as Director of Children and Family Services ("CFS") for San Bernardino County. At all times relevant to this Complaint, Zepeda acted under color of state law and within the course and scope of her official duties. As Director, Zepeda exercised final policymaking authority with respect to CFS policies, practices, supervision, training, and procedures. Zepeda is sued in her official capacity. Plaintiff reserves the right to seek leave to amend to assert individual-capacity claims if warranted by facts revealed through discovery.

6.    **Defendant SAL ARREDONDO** ("Arredondo") was, at all relevant times, a Social Services Practitioner employed by San Bernardino County Children and Family Services ("CFS"). At all times relevant to this Complaint, Arredondo acted under color of state law and within the course and scope of his official duties. Arredondo is sued in his individual and official capacities.7.

7.    **Defendant SAN BERNARDINO COUNTY** ("County") is a political subdivision of the State of California that operates Children and Family Services ("CFS") as a department within its Human Services system. At all times relevant to

this Complaint, County employees and officials acted under color of state law. The County is sued pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services,* 436 U.S. 658 (1978).

8.   **Defendants DOES 1–10** ("Doe") are persons or entities whose identities are presently unknown to Plaintiff, including employees, agents, officials, or others who acted under color of state law and/or in coordination with state actors at all relevant times in connection with the events alleged herein. These Defendants participated in, authorized, ratified, facilitated, or failed to prevent the conduct alleged. Plaintiff may amend this Complaint to identify such Defendants and their capacities if and when appropriate.

# V. STATEMENT OF FACTS

## A. UNREASONABLE SEIZURE: WARRANTLESS CHILD REMOVAL

9.   On October 15, 2025, at about 11:00 a.m., Plaintiff and his then-seventeen-year-old daughter, S.R.W-C., were at Plaintiff's home in Fontana, California.

10.   Two San Bernardino County Children and Family Services (CFS) social workers, "Arredondo" and Luviano, SSP, ame to the home. A Fontana Police officer (Officer Padilla) was with them.

11.   Defendant "Arredondo" handed Plaintiff a paper document titled "Detention Warrant and Affidavit" (Warrant ID 000189629) (Exhibit A) alleging the document authorized the removal of the Plaintiff's child, S.R.W-C. from his custody.

12.     The Plaintiff looked at the document provided "Arredondo", and then alleged that the document did not appear to be legitiment, and that he did not agree to the removal of his minor child S.R.W-C.

13.     The child became tearful, stated she did not want to leave, and became visibly distressed.

14.     Corporal Guith (Fontana PD) arrived at the Plaintiff's home following the Plaintiff questioning the document. Corporal Guith said the document appeared valid because it had a judge's signature.

15.     Despite the Plaintiff's unwillingness to consent and the child not wanting to leave, and visible distress, "Arredondo" took custody of S.R.W-C. and removed her from Plaintiff's home. Police remained on scene while the "Arredondo" and "Doe" completed the removal.

16.     That evening at 8:21 p.m., "Arredondo" texted Plaintiff: *"Hi Steven, just wanted to let you know that [S.R.W-C] is placed and is safe."*

## B. THE DOCUMENTS PRESENTED AT REMOVAL, FACIAL DEFECTS AND MISCLASSIFICATION OF AUTHORITY

17.     At the scene on October 15, 2025, "Arredondo" presented Plaintiff with a paper document titled "Detention Warrant and Affidavit," bearing the designation "CFS 43 DETENTION (10/18)" and Warrant ID No. 000189629. (Exhibit A)

18.     The document cited California Penal Code § 1524 as the statutory authority for its issuance and contained language authorizing "entry and search of premises."

19. The document listed three separate addresses, Plaintiff's residence, the child's mother's residence, and the child's school, without identifying where the child was located at the time of service or which location formed the basis for removal.

20. The document stated that an "attached and incorporated statement of probable cause" supported issuance of the warrant; however, no such attachment or sworn narrative was provided to Plaintiff at the scene, or since.

21. The document did not include any sworn, particularized statement describing the conduct alleged to place the child at risk, the timeframe of any alleged risk, the location where such risk was occurring, the duration of removal authorized, any efforts made to avoid removal, or facts explaining why immediate removal was necessary.

22. The document contained only generalized references to possible "sexual abuse" or "serious physical or emotional harm," without identifying who allegedly committed such acts, when they occurred, where they occurred, or how the child faced imminent danger requiring immediate seizure.

23. The document did not state any facts indicating exigent circumstances, urgency, or an immediate threat that could not be addressed through less intrusive means.

24. The document exhibited internal pagination inconsistencies: (a) one page was numbered simultaneously as "Page 1 of 2" and "Page 7 of 9"; (Exhibit A) (b) another page was numbered simultaneously as "Page 2 of 2" (Exhibit A2) and "Page 8 of 9"; and (c) the final page was numbered "Page 9 of 9 (Exhibit A3)."

25.   The final page of the document stated: "Based on the showing set forth in the incorporated affidavit, having been sworn to as true and subscribed before me by telephone, I find probable cause for issuance of this detention warrant and I do so issue it." The document identified Judge Jerry E. Johnson and reflected an issuance time of 9:30 a.m. on October 15, 2025. (Exhibit A3)

26.   After the removal, Plaintiff inquired with County Counsel regarding the telephonic oath referenced in the document. County Counsel informed Plaintiff that no telephonic recording exists memorializing any oath or testimony supporting issuance of Warrant ID No. 000189629.

27.   The document did not reference Welfare and Institutions Code § 340, did not utilize a Judicial Council protective custody warrant form, and did not contain findings regarding imminent danger, necessity of removal, or the scope or duration of custody.

28.   Instead, the document cited Penal Code § 1524, used "entry and search of premises" language, and followed a format consistent with criminal search warrants. Plaintiff was not provided at the scene with any order under Welfare and Institutions Code § 340, any sworn statement of probable cause, or any particularized findings authorizing removal of his child.

## C. PARENTAGE, NOTICE, AND MISCLASSIFICATION

29.   Plaintiff is the child's biological and legal parent. At all relevant times, Plaintiff provided housing, daily care, financial support, and was actively involved in the child's education and medical needs. The child resided primarily with Plaintiff during the two years preceding removal.

30. Documents readily available and of record: (a) The child's birth certificate lists Plaintiff as the father. (b) March 1, 2010 Superior Court of California, County of San Bernardino judgment of parentage identifies Plaintiff as the child's legal parent based on a Voluntary Declaration of Parentage (VDOP) executed at birth (Exhibit E ). County Counsel released protected CFS records to Plaintiff on September 22, 2025 based on Plaintiff's parentage. These parentage records were known or readily available to CFS before October 15, 2025.

31. Nevertheless, Defendants did not provide Plaintiff with meaningful notice at the scene, did not seek or obtain parental consent, and did not limit their actions to narrowly tailored measures based on specific, articulable exigent facts.

32. Plaintiff received no prior notice, findings, or opportunity to contest any removal before his child was taken from his home.

## D. CHILD ABUSE CENTRAL INDEX LISTING

33. On or about October 18, 2025, Plaintiff received a mailed notice, postmarked October 16, 2025, stating that he had been listed on the California Child Abuse Central Index ("CACI"). The notice was dated October 15, 2025 and identified "Arredondo" as the responsible county staff member.

34. The notice classified the allegation as *"substantiated: emotional and mental abuse,"* without identifying any factual basis, conduct, location, timeframe, or evidence supporting the listing. The allegation differed from those referenced in the document presented at the scene on October 15, 2025. (Exhibit D)

35. The notice provided incomplete and misleading grievance instructions, including only an internal one-page procedure and directions to mail objections

to an improper address. Plaintiff was not provided meaningful notice or a fair opportunity to challenge the listing.

36.    The grievance instructions provided with the CACI notice were incomplete. Plaintiff received only page two of two of the referenced instructions and was directed to submit a grievance to a "DOJ Clerk" at a CFS post office box in Colton, California, which was not proper (Exhibit D).

37.    As a result of the CACI listing, Plaintiff was labeled by the State as a substantiated child abuser without prior notice, a meaningful opportunity to be heard, or a factual explanation of the basis for the finding.

## E. CONFLICTING 10/17 PETITION
## & 10/17 DETENTION REPORT

38.    On October 17, 2025, Plaintiff obtained copies of the following documents from the San Bernardino County Court Clerk:
(a) a Welfare and Institutions Code § 300 Petition, signed under penalty of perjury by "Arredondo" and filed October 17, 2025 (Exhibit B); and
(b) a Detention Report, signed and filed October 17, 2025, by "Arredondo" and supervisor Sharon Gonzales, SSSP, and submitted as "Respectfully Submitted by "Zepeda" (Exhibit C).

39.    Both the Petition and the Detention Report misclassified Plaintiff as the child's "alleged father," despite records known or available to the agency identifying Plaintiff as the child's parent, including records previously relied upon by County Counsel to release protected CFS materials to Plaintiff.
     The Petition and Detention Report, both filed on October 17, 2025 and

addressing the same alleged circumstances, contain materially contradictory factual assertions regarding Plaintiff's mental-health and treatment status. Plaintiff pleads these contradictions with particularity:

(a) The § 300 Petition, signed under penalty of perjury by "Arredondo", claims that the child's alleged abuse or neglect was caused by both parents' *"failure to protect"* under § 300(b)(4), based on alleged *"untreated mental-health"* issues and *"refusal to seek mental-health treatment."* (Exhibit B3 at 3:B2.)

(b) The Detention Report, signed by "Arredondo" and Supervisor Gonzales, SSSP, and "Respectfully Submitted by 'Zepeda'" on the same date, states that both parents were participating in therapy. That the Plaintiff was in therapy (Exhibit C at 18:6-7) and receiving treatment for ADHD (Exhibit C6 at 14:20-22.)

(c) Plaintiff had been engaged in mental-health therapy for approximately ten years (Exhibit I) and had been receiving treatment for ADHD for approximately two years prior to October 17, 2025, facts consistent with the Detention Report and inconsistent with the Petition's allegations of *"untreated mental-health"* and *"refusal to seek treatment."*

**40.**    The mutually exclusive factual assertions contained in the Petition and Detention Report, both signed and filed on the same date, 10/17/25, could not simultaneously be accurate. The Petition signed under penalty of perjury by "Arredondo." (Exhibit B2.) The Detention Report signed by "Arredondo," Gonzalez, SSSP, and "Respectfully Submitted by 'Zepeda,'" (Exhibit C18)

# F. PRE-WRITTEN COURT FINDINGS & ORDERS

41.     The Detention Report filed on October 17, 2025 included court findings and orders that had not been made at any hearing and could not have been made at the time the report was written. (Exhibit C13-17 at 30-34).

42.     Court Review Statement. The Detention Report states: *"Court has read and considered the social worker's report dated Oct. 20, 2025."* (Exhibit C13 at 30:7.) The referenced date is in the future.

43.     Prima Facie Findings. The Detention Report states:
(a) *"A prima facie case is established that the child comes within Welfare and Institutions Code (WIC) 300."* (Exhibit C13 at 30:14-15); and
(b) *"Prima facie case established for detention out-of-home."* (Exhibit C13 at 30:16.)

44.     Relative Placement Finding. The Detention Report states: *"The Court has considered the social worker's emergency assessment of the following relative(s), adult sister Kacie West-Brady, and finds the relative(s) is appropriate to temporarily care for S.R.W-C."* (Exhibit C14 at 31:13-15.)

45.     At the time the Detention Report was filed, the child had already been removed from Plaintiff's home and placed with Kacie West-Brady, as shown by text messages from Defendant Arredondo days earlier and text messages from the child, to her cousin, the day prior.

46.     Removal Status. The Detention Report further states: *"S.R.W-C. is detained in appropriate placement at Ms. W-B."* (Exhibit C15 at 32:11.)

47.    Medical Examination Authorization. The Detention Report states: *"The Court authorizes forensic medical examinations to be completed at the Children's Assessment Center (CAC), Loma Linda University Children's Hospital, or the Resiliency Institute for Childhood Adversity."* (Exhibit C16 at 33:18–20.)

48.    Visitation Orders. The Detention Report states that both parents are permitted supervised visitation through the county agency or its delegate for one visit per week, two hours per visit. (Exhibit C16 at 33:18–24.)

49.    The statements listed above appear in the Detention Report signed, filed and dated October 17, 2025 by "Arredondo", Supervisor Gonzales, and under authority of "Zepeda" as already adjudicated court findings and orders, placement decisions, and authorizations that reflect actions already taken without any court hearing having taken place. (Exhibits C18.)

## G. CONFLICTING REMOVAL & PLACEMENT INFORMATION

50.    The Detention Report filed on October 17, 2025 contains inconsistent statements regarding when and how the child was removed from Plaintiff's care by by "Arredondo" and placed with a relative on the same day as removal.

51.    The Detention Report states that the home of Kacie West-Brady was assessed on October 15, 2025, Ms Persons SSSP, under Welfare and Institutions Code § 361.3 factors *"to place the child with family if the court removes her."* (Exhibit C11 at 28:19–20.)

52.    However, on October 15, 2025, at 8:21 p.m., "Arredondo" sent Plaintiff

a text message stating that the child had already been placed and was safe, confirming that removal and placement had already occurred earlier that day.

53.    The child, S.R.W-C., independently confirmed the placement in a text message sent to her cousin, Emilee, on October 16, 2025, at 3:35 p.m., *"...my sister just signed papers to be my foster mom.."* and *"the worst part is it seems like it's literally just out of spite like they kept syaing 'hopefully this'll show your parents'..."*

54.    Plaintiff later obtained an October 24, 2025 certified copy of the Relative Information form completed by Kacie West-Brady, which is dated October 20, 2025. No document dated before October 20, 2025 identifies Ms. West-Brady as an approved or authorized caregiver.

55.    The sequence of documents and communications shows that the child was removed from Plaintiff's custody and placed with Kacie West-Brady without any legal authorization and before completion of the relative placement paperwork referenced in the Detention Report.

## H. PLAINTIFF'S HISTORY IN THE DETENTION REPORT

56.    The Detention Report includes sections labeled "CFS history" and "criminal history" that contain inaccurate, incomplete, and misleading information attributed to Plaintiff. Plaintiff pleads the following examples to illustrate the unreliability of the histories presented, without limitation.

57.    In the "CFS history" section, the Detention Report lists three purported

CFS referrals attributed to Plaintiff in 2024. (Exhibit C10 at 27:4–6.) Plaintiff has obtained CFS records through official disclosure, and those records contain no such referrals. No referral numbers, investigative summaries, intake notes, or closing dispositions corresponding to these entries exist in Plaintiff's CFS file.

58.   In the "criminal history" section, the Detention Report contains misleading and inaccurate information regarding Plaintiff's criminal background. As one representative example, the report lists a September 2, 2008 entry attributed to Plaintiff. (Exhibit C9 at 25:25.) That entry concerns an allegation that was dismissed approximately seventeen years earlier and does not reflect a conviction, sustained finding, or pending matter. The Detention Report omits the dismissal and presents the allegation without disposition, context, or clarification, creating a false and misleading impression of Plaintiff's criminal history.

59.   These examples are representative. The Detention Report presents Plaintiff's CFS and criminal histories in a manner that omits material context, includes unsupported entries, and conveys an inaccurate portrayal of Plaintiff's background.

## I. THE 10-DAY OPEN REFERRAL:
## EVENTS PRIOR TO REMOVAL

60.   On September 26, 2025, at approximately 1:18 p.m., Plaintiff received multiple text messages and phone calls from his daughter, S.R.W-C., while she was at school. She stated that she was being interviewed by officers, later determined to be CFS, was crying, believed she was in trouble, that her mother had been contacted. She then asked her dad, the Plaintiff, to pick her up from school. This was the first time Plaintiff became aware of CFS involvement.

61. Plaintiff later learned that the child's mother contacted San Bernardino County CFS and separately contacted the National Child Exploitation Hotline in New York, making allegations concerning Plaintiff.

62. As a result of the mother's report, CFS opened a 10-Day Open Referral on September 18, 2025.

63. According to the October 17, 2025 Detention Report, "Arredondo" and Luviano, SSP, conducted an initial interview with the child's mother on September 22, 2025 regarding the 10-Day Open Referral. (Exhibit C3 at 5:2)

64. Although the Detention Report alleges that the mother was advised on September 22, 2025 of both the 10-Day Open Referral and a Welfare and Institutions Code § 300 matter, no WIC § 300 petition was filed until October 17, 2025, twenty-three days later. (Exhibit C3 at 5:8)

65. On September 23, 2025, Plaintiff received an email from San Bernardino County Counsel providing protected records from a March 2023 Child Assessment Center forensic interview. Those records show that the child described statements about Plaintiff as coming from her mother and half-sister, rather than from her own experiences. When compared to a 2019 mediation report, in which the child described the same events from her own memory, the records reflect material differences in how the statements were presented. The March 2023 forensic materials were not provided to Plaintiff or to the court, despite a February 23, 2023 court order directing collateral contact with CFS in connection with a FC § 3118 investigation requested by Plaintiff.

66. On September 25, 2025, at approximately 4:52 p.m., Plaintiff received a

52-minute telephone call from CFS management, including Kristin Hinds, Deputy Director of CFS Western Region, and Mia Moore, Assistant Director.

67.    During that call, Plaintiff raised concerns regarding agency procedures, records handling, and prior referrals. Plaintiff was not provided substantive information regarding the status of any referral and was not informed that a 10-Day Open Referral was ongoing or that a WIC 300 was initiated.

68.    On September 26, 2025, CFS interviewed the child, S.R.W-C., at her school without the Plaintiff's consent. According to the Detention Report, the child expressed distress related to parental conflict and stated that her mother became upset and made her feel bad when she went with her father, the Plaintiff. The child further stated that when she was younger, her confusion had been misrepresented by her mother to CFS and that she wished to correct the record. (Exhibit C4 at 10:8-11) The Detention Report does not reflect that the child was permitted to do so.

69.    On September 27, 2025, at approximately midnight, officers from the Fontana Police Department arrived at Plaintiff's residence and interviewed Plaintiff and the child separately regarding the exploitation allegations.

70.    September 28, 2025 marked the final day of the 10-Day Open Referral opened on September 18, 2025. CFS did not contact Plaintiff during the referral period.

71.    On September 30, 2025, at approximately 9:57 a.m., Detective Sandoval of the Fontana Police Department ICAC Task Force contacted Plaintiff by telephone and stated that Plaintiff had fully cooperated and that, based on the

investigation, the matter was being considered closed as to Plaintiff. The call lasted approximately 22 minutes.

72.    On September 30, 2025, at approximately 11:31 a.m., Plaintiff contacted the CFS Rancho Cucamonga office to inquire about the status of the referral.

73.    On September 30, 2025, Plaintiff received a letter from "Zepeda", via Next Request, concerning the March 2023 forensic interview and related records requests. "Zepeda" stated that CFS had not been ordered to comply with any court directive and advised Plaintiff to seek legal counsel if he required further assistance.

74.    On October 1, 2025, "Arredondo" contacted Plaintiff by text message returning Plaintiff's prior call and requested to speak either that day, later that week, or the following week. Three days after the Open Referral.

75.    On October 3, 2025, Plaintiff met in person with "Arredondo" and Luviano, SSP, who confirmed that the child's mother had contacted both CFS and the National Child Exploitation Hotline. Plaintiff advised "Arredondo" that the allegations had been resolved by third-party agencies and provided information regarding witnesses and records relevant to the allegations.

76.    On October 6, 2025, Plaintiff emailed a letter to the "County" CEO, AEO, "Zepeda," and Child Welfare Services Manager Jane Canu, requesting an executive-level oversight meeting due to unresolved concerns, exhaustion of local remedies, and fear of retaliation. Plaintiff received no repsonse.

77.    On October 7, 2025, Plaintiff met with Detective Sandoval, who confirmed

that Plaintiff had fully cooperated and that no wrongdoing had been identified. Detective Sandoval further stated that, in his view, the child's mother had engaged in *"cop shopping."*

78.    On October 7, 2025, at approximately 3:04 p.m., Plaintiff provided "Arredondo," by text message, copies of a September 17, 2025 incident report [Fontana PD: 250907508] and related information relevant to the allegations. These materials were omitted from the October 17, 2025 Detention Report.

79.    On October 9, 2025, at 11:46 a.m., Plaintiff received an email from "Zepeda" referring to an "open referral," seventeen days after the 10-Day Open Referral period had expired, no WIC 300 advisal, and advising Plaintiff to share information with the assigned social worker. Plaintiff responded confirming that he had already done so, expressing concerns, providing, and  additional information. All of which has omitted by all CFS documents.

80.    Six days later, on October 15, 2025, the child, S.R.W-C., was removed from the Plaintiff's care by "Arredondo" and Luviano, SSP, as "County" CFS social workers, acting under the color of law, without prior notice or any documented specific allegations and/or urgency.

## J. DAMAGES

81.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered loss of custody and interference with familial association; deprivation of procedural and substantive due process; emotional distress, anxiety, humiliation, and mental anguish; reputational harm; economic loss, including out-of-pocket expenses and lost opportunities; other compensatory damages according to proof.

# VI. CLAIMS

## COUNT I: 42 U.S.C. § 1983

### FOURTH AMENDMENT: UNLAWFUL SEIZURE

(Against "Arredondo," in his Individual Capacity)

**Incorporation by Reference:**

82.    Plaintiff incorporates by reference Paragraphs 9–32 of the Statement of Facts as if fully set forth herein.

**Seizure Allegation:**

83.    On October 15, 2025, "Arredondo", a "County" Children and Family Services social worker acting under color of state law, removed Plaintiff's minor daughter, S.R.W-C., from Plaintiff's custody at Plaintiff's home in Fontana, California.

84.    The removal was effected by a show of authority and police presence, over Plaintiff's express refusal to consent and the child's stated objection.

85.    The nonconsensual removal of a child from parental custody by government actors through a show of authority constitutes a seizure within the meaning of the Fourth Amendment. See *Wallis v. Spencer*, 202 F.3d 1126, 1137–38 (9th Cir. 2000)

**Legal Standard:**

86.    Under Ninth Circuit precedent, removing a child from a parent's custody is constitutionally reasonable only if officials possess either (a) valid pre-seizure judicial authorization, or (b) specific, articulable facts establishing that the child faces imminent danger of serious bodily harm and that immediate seizure is

necessary to prevent that harm during the time required to obtain a court order. See *Wallis,* 202 F.3d at 1138; *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1107–08 (9th Cir. 2001); *Rogers v. Cnty. of San Joaquin,* 487 F.3d 1288, 1294–95 (9th Cir. 2007); *Keates v. Koile,* 883 F.3d 1228, 1236–38 (9th Cir. 2018); *Demaree v. Pederson,* 887 F.3d 870, 878–83 (9th Cir. 2018).

87.    Generalized, vague, or conclusory assertions of risk are insufficient; officials must point to specific, articulable facts known at the time of seizure demonstrating imminent serious bodily harm. See *Wallis,* 202 F.3d at 1138; *Rogers,* 487 F.3d at 1294–95; *Keates,* 883 F.3d at 1238.

88.    The reasonableness of the seizure is judged by the information known to the official at the moment of removal. See *Wallis*, 202 F.3d at 1138; *Demaree*, 887 F.3d at 878–79.

**Application to Facts:**

89.    At the scene, no valid pre-seizure judicial authorization to remove the child from Plaintiff's custody was communicated to Plaintiff.

90.    The document shown to Plaintiff at the scene was titled 'Detention Warrant and Affidavit,' cited **Penal Code § 1524**, authorized 'entry and search of premises,' listed multiple addresses without identifying the child's location, and referenced an attached sworn statement that was not provided. On its face, the document did not communicate any particularized findings of imminent danger or authorization to remove the child from Plaintiff's custody. (See ¶¶ 17–23.)

91.    "Arredondo" did not articulate any specific time-sensitive facts demonstrating that S.R.W-C. faced imminent danger of serious bodily harm that

could not await judicial process, and did not explain why less intrusive measures would be inadequate at that moment. See *Wallis*, 202 F.3d at 1138; *Rogers,* 487 F.3d at 1294–95.

92.    The information presented at the scene consisted of generalized references to possible harm and did not identify who posed a threat, what specific conduct created an imminent danger, when the conduct occurred, where the danger existed, or how immediate seizure was necessary to prevent serious bodily harm. (See ¶¶ 21–23.) See *Keates*, 883 F.3d at 1238; *Demaree,* 887 F.3d at 878–79.

93.    No exigent circumstances were articulated or otherwise present at the time of removal that required immediate seizure before obtaining or communicating valid judicial authorization. See *Mabe*, 237 F.3d at 1108; *Rogers,* 487 F.3d at 1294–95.

94.    Because no valid pre-seizure judicial authorization was communicated and no exigent circumstances were present, the seizure of S.R.W-C. from Plaintiff's custody was unreasonable under the Fourth Amendment. See *Wallis*, 202 F.3d at 1137–38; *Demaree,* 887 F.3d at 878–83.

**Causation and Harm:**

95.    "Arredondo's" acts and omissions were intentional and undertaken under color of state law, and were the proximate cause of the deprivation of Plaintiff's rights to be free from unreasonable seizure and to maintain custody of his child absent lawful justification.

96.    As a direct and proximate result, Plaintiff and his child, S.R.W.-C., were separated, and Plaintiff suffered emotional distress, loss of familial association, and

related harms.

**Qualified Immunity:**

97.    Qualified immunity does not bar this claim. At the time of the events, it was clearly established in the Ninth Circuit that removing a child without a valid pre-seizure court order or specific, articulable exigent circumstances violates the Fourth Amendment. See *Wallis,* 202 F.3d at 1137–38; *Mabe*, 237 F.3d at 1107–08; *Rogers*, 487 F.3d at 1294–95; *Keates*, 883 F.3d at 1236–38; *Demaree*, 887 F.3d at 878–83.

**Prayer for Relief:**

98.    Plaintiff seeks relief as set forth in the Prayer for Relief (Page 46)

## COUNT II: 42 U.S.C. § 1983

### FOURTEENTH AMENDMENT: PROCEDURAL DUE PROCESS

(Against "Arredondo," in his Individual Capacity

and "Zepeda" in her Official Capacity.)

**Incorporation by Reference:**

99.    Plaintiff incorporates by reference Paragraphs 9–81 of the Statement of Facts and Paragraphs 4–8 (Parties) as if fully set forth herein.

**Protected Interest:**

100.    Plaintiff had a constitutionally protected liberty interest in the care, custody, companionship, and society of his minor child as the child's biological and adjudicated/legal father and a primary custodial caregiver. The parental liberty interest is well established and includes protection against state-initiated separations absent due process except in true emergencies. *Mathews v. Eldridge*;

Ninth Circuit model instruction 9.32.

**Actors and Capacities:**

101.  "Arredondo" was a Social Services Practitioner with "County" CFS and acted under color of state law at all times. "Zepeda" was "County" Director of Human Services and Children & Family Services and is sued in her official capacity as the Director and policymaker for "County" Human Services and CFS. She authorized agency actions and reports. (See Parties ¶¶4–8.)

**Elements of the Procedural Due Process Claim:**

102:  To state a procedural-due-process claim, Plaintiff pleads: (a) a protected liberty interest (custody and familial association); (b) a government-caused deprivation of that interest; and (c) the absence of constitutionally adequate process (notice and an opportunity to be heard) at a time and in a manner required by the circumstances. *Mathews v. Eldridge,* 424 U.S. 319 (1976).

**Allegations, Notice, Opportunity to Be Heard, and Procedural Failures:**

103.  CFS opened a 10-Day Open Referral on September 18, 2025 that expired on September 28, 2025. Plaintiff was not contacted during the active referral period and received no notice that CFS intended to seek detention or removal of the child during or immediately after that period. (See Statement of Facts ¶¶62–71.)

104.  "Zepeda" had actual knowledge of the open referral and communicated with Plaintiff on September 30 and October 9, 2025 by written correspondence and email, but did not ensure that Plaintiff received meaningful notice of any intended detention or opportunity to present information before any deprivation occurred. (See ¶¶63, 73, 79.)

105.   Plaintiff was never given advance notice that CFS intended to seek removal or detention of the child, was never afforded a meaningful pre-deprivation opportunity to respond, to submit exculpatory evidence, or to be heard, and was not provided contemporaneous findings explaining any exigency that purportedly justified an immediate seizure without prior notice. (See ¶¶32, 60–66, 74–80.)

106.   On October 15, 2025, the child was removed from Plaintiff's custody at Plaintiff's home without prior notice or an opportunity to be heard despite absence of articulated exigent circumstances; the deprivation thus occurred before any judicial hearing and without the constitutionally required pre-deprivation procedures in these circumstances. (See ¶¶9–16, 80.)

107.   Thereafter, Plaintiff was listed on the California Child Abuse Central Index (CACI) by "Arredondo" as "substantiated: emotional and mental abuse," which carried statutory and practical consequences, without prior notice or a meaningful opportunity to contest the listing, and the grievance materials provided were constitutionally deficient. (See ¶¶33–37.)

**Legal Standard- Notice and Process:**

108.   Procedural due process requires balancing under *Mathews v. Eldridge* of (1) the private interest affected, (2) the risk of erroneous deprivation through the procedures used and the probable value of additional safeguards, and (3) the government's interest and administrative burdens. *Mathews v. Eldridge*.

109.   In the child-removal context, Ninth Circuit precedent makes clear that parents will not be separated from their children without due process except in emergencies; removal without prior court authorization is permissible only where there is a judicial order or specific, articulable exigent facts showing imminent risk of serious harm. See *Mabe v. San Bernardino County; Jones v. Wang; Demaree v.*

*Pederson*. The adequacy of process is judged by what was known and provided at the time of the deprivation.

110.    Inclusion on centralized child-abuse registries such as CACI implicates the "stigma-plus" doctrine and may constitute a cognizable procedural-due-process injury when the listing carries statutory or practical consequences and the administrative procedures to contest the listing are constitutionally deficient. *Humphries v. County of Los Angeles*.

**Application of Law to Facts:**

111.    The *Mathews* balancing test weighs heavily in favor of pre-deprivation procedures here: Plaintiff's private interest in custody of a child is of the highest order; the risk of erroneous deprivation was substantial because the agency did not notify Plaintiff during the 10-Day Open Referral, did not provide him an opportunity to supply exculpatory materials (including records previously released by County Counsel), and removed the child without giving Plaintiff prior notice; and the governmental interest in child protection does not justify bypassing notice and an opportunity to be heard where no particularized, articulable exigency was communicated or reasonably apparent. *Mathews v. Eldridge*; *Mabe; Jones*.

112.    "Zepeda's" prior communications with Plaintiff, her supervisory role, and the agency records in County Counsel's possession establishing Plaintiff's parentage created an obligation for supervisory and policymaking actors to ensure that procedures were followed to provide notice and an opportunity to respond before effectuating a deprivation in the absence of exigent circumstances. (See ¶¶29–31, 63, 73, 79.) Under the *Mathews* framework and Ninth Circuit precedent, the "County" and "Zepeda" could and should have taken reasonable procedural steps to afford Plaintiff notice and an opportunity to be heard prior to removal

absent a clearly articulated exigency.

113.   Plaintiff was not afforded constitutionally adequate process when the child was removed on October 15, 2025: there was no communicated judicial order or contemporaneous showing of exigent circumstances to justify pre-hearing removal, Plaintiff received no prior notice or chance to present records or witnesses, and the CACI listing and its defective grievance materials deprived Plaintiff of a meaningful administrative opportunity to contest the stigmatizing listing. These facts state a plausible procedural-due-process claim under the Fourteenth Amendment. *Mathews; Humphries; Mabe.*

**Causation and Harm:**

114.   Defendants' failure to provide constitutionally adequate notice and procedures was the proximate cause of Plaintiff's deprivation of the parental custodial interest, separation from his child, emotional distress, reputational injury from the CACI listing, and other damages alleged in the Complaint. (See ¶81.)

**Qualified Immunity:**

115.   Qualified immunity does not bar Plaintiff's procedural-due-process claim. The right not to be deprived of custody of one's child without constitutionally adequate notice and an opportunity to be heard, except in true emergencies, was clearly established in the Ninth Circuit well before October 15, 2025. Ninth Circuit decisions have repeatedly held that parents may not be summarily deprived of custody without either judicial authorization or particularized, articulable exigent facts and that mandated notice and hearing requirements apply in juvenile/ detention contexts; officials may not ignore those requirements where they can be satisfied absent true exigency. See *Ram v. Rubin; Mabe; Rieman v. Vasquez; Demaree.*

116.    A reasonable social-services practitioner or director in Defendants' positions would have known that failing to provide notice of intended detention/removal during an open referral period, ommitting exculpatory evidence, fabricating history, failing to afford the parent an opportunity to submit exculpatory evidence and be heard before removing the child absent a clearly articulated exigency, and placing the parent on CACI without meaningful grievance procedures risked violating clearly established procedural-due-process rights. See *Rieman; Demaree; Ram; Humphries.*

**Prayer for Relief:**

117.    Plaintiff seeks relief as set forth in the Prayer for Relief (Page 46)

## COUNT III: 42 U.S.C. § 1983:

### FOURTEENTH AMENDMENT: SUBSTANTIVE DUE PROCESS

(Against "Arredondo," in his Individual Capacity

and "Zepeda" in her Official Capacity.)

**Incorporation by Reference:**

118.    Plaintiff incorporates by reference Paragraphs 9–80 of the Statement of Facts and Paragraphs 4–8 (Parties) as if fully set forth herein.

**Actors and Titles:**

119.    "Arredondo"was a Social Services Practitioner with "County" CFS and acted under color of state law at all times.  "Zepeda" was "County" Director of Human Services and Children & Family Services CFS and is sued in her official capacity and acted under color of state law at all times. (See Parties ¶¶4–8.)

**Background / Protected Interest:**

120,    Parents and children possess a fundamental liberty interest in their familial

association and in a parent's care, custody, and companionship of his child. *Troxel v. Granville* recognizes the parental liberty interest; Ninth Circuit precedent confirms that state-initiated removal implicates that fundamental interest.

121.   A substantive due process claim for interference with familial association requires (1) a deprivation of the parent–child relationship and (2) government conduct that "shocks the conscience." *Wallis v. Spencer* and related Ninth Circuit decisions make clear that removal of a child without judicial authorization or without particularized, articulable exigent facts can violate substantive due process when the government's conduct is arbitrary or conscience-shocking.

122.   The Ninth Circuit has explained that removals must be supported by a court order or by specific, articulable facts showing imminent danger of serious bodily injury; when officials remove children absent such justification, a substantive claim may lie where the conduct is arbitrary and conscience-shocking. *Rogers v. County of San Joaquin, Demaree v. Pederson, and Keates v. Koile* articulate and apply these principles in the family-separation context.

**Application- Facts to Legal Standard:**

123.   Long-standing custodial relationship. Plaintiff was the child's biological and adjudicated/legal father and the child resided primarily with Plaintiff for the two years preceding October 15, 2025, establishing the protected familial and custodial relationship at issue. (See ¶¶29–31.)

124.   Arbitrary removal without imminence. On October 15, 2025 "Arredondo" removed the child from Plaintiff's home over Plaintiff's express refusal and the child's visible distress. The removal occurred before any judicial hearing and without notice or an opportunity to be heard. No particularized, articulable facts of

imminent risk were communicated or otherwise present to justify an immediate, warrantless removal. Those allegations describe removal that was not narrowly tailored to any identified emergency and squarely implicate the standards applied in *Wallis, Mabe, and Demaree*.

125.    Ignored exculpatory information. Defendants had access to "County" records and information (including parentage records released by County Counsel and materials Plaintiff supplied) that showed Plaintiff's custodial status and contained exculpatory facts, yet the removal proceeded and post-seizure materials omitted or failed to credit those exculpatory materials. The factual allegations therefore support the inference that the intrusion was not a reasoned, narrowly tailored protective measure but an arbitrary disruption of the parent–child relationship.

126.    Excessiveness and lack of narrow tailoring. The removal and placement actions, including immediate out-of-home placement and restrictions imposed absent contemporaneous, articulable exigent facts, were excessive relative to any legitimate child-protection purpose alleged in the record; the Ninth Circuit has repeatedly held that such overbroad seizures are constitutionally suspect where less intrusive measures would suffice. *Keates* and *Demaree* apply these principles where removals exceeded what was necessary to protect children.

**Why the Conduct Shocks the Conscience:**

127.    Conduct shocks the conscience when it reflects either a purpose to harm or deliberate indifference to the protected liberty interest. The pattern alleged here, a custodial parent known to the agency, absence of notice or opportunity to contest, removal without contemporaneous exigent facts, omission of exculpatory records, and immediate out-of-home placement, constitutes arbitrary governmental action not plausibly grounded in a legitimate protective need and is therefore

conscience-shocking under Ninth Circuit precedent. *Wallis, Rogers, Demaree*, and related decisions identify similarly arbitrary, non-narrow seizures as inconsistent with substantive due process protections for familial association.

128.   The totality of the alleged conduct (direct seizure by "Arredondo" at the home; no lawfully communicated judicial authorization; failure to use less intrusive measures; placement and CACI listing that followed) permits the plausible inference that the state's actions were arbitrary and conscience-shocking rather than reasoned, narrowly tailored interventions to address an immediate threat. *Keates* and *Demaree* describe comparable circumstances where summary removal without adequate factual support violated substantive due process.

**Official-Capacity / Ratification Allegations Against Director Zepeda:**

129.   "Zepeda", sued in her official capacity, is alleged to have supervisory and policymaking responsibility for "County" Human Services and CFS policies, detention reports, and removal procedures and to have ratified, authorized, or permitted practices that allowed arbitrary removals without required safeguards (including filing/submission practices and protocols governing notice and pre-removal procedures). Allegations that the Detention Report and related materials were submitted under her authority (Exhibit C8 at 22:7) and that she communicated with Plaintiff but failed to ensure processes were followed support a plausible official-capacity theory that the challenged practices were authorized, adopted, or tolerated by final policymakers. Ninth Circuit precedent permits official-capacity relief where policymaker ratification or municipal policy is the moving force behind conscience-shocking conduct.

**Causation and Damages:**

130.   Defendants' conduct was a direct and proximate cause of Plaintiff's separation from his child, emotional distress, loss of familial association, reputational injury, and other damages alleged in the Complaint. (See ¶81.) The alleged interference with the familial relationship is the constitutional injury for which Plaintiff seeks redress.

**Qualified Immunity:**

131.   Qualified immunity does not shield "Arredondo" and does not bar official-capacity relief against "Zepeda" in her policymaking function. Ninth Circuit case law has long signaled that parents have a substantive due process right to familial association that is infringed by arbitrary, non-narrow governmental interference and that seizure of children without judicial authorization or articulable exigent facts may violate that right when the conduct shocks the conscience. Cases such as *Wallis, Demaree, Keates*, and *Rogers* provided fair warning to reasonable social-services officials and supervisors that summary, unwarranted removal of a custodial child absent particularized exigency or narrow tailoring could violate substantive due process. A reasonable social worker or director in Defendants' positions would therefore have had fair notice that the challenged removal and associated practices risked violating clearly established constitutional rights.

132.   Even if certain borderline fact patterns might present close calls for warrantless removal (see Ninth Circuit authorities discussing exigency nuances), the facts pleaded here, known parentage, absence of notice or investigative contact during the open referral, no articulated exigency, no documented WIC 300 notice prior to removal, removal at the home over objection, service of a defective 'Detention Warrant and Affidavit' and immediate out-of-home placement, allege

conduct sufficiently beyond the pale that qualified immunity should not apply at the pleading stage. *Demaree* and *Keates* confirm that where factual allegations show lack of reasonable cause and lack of narrow tailoring, qualified immunity is inappropriate.

**Prayer for Relief:**

133.   Plaintiff seeks relief as set forth in the Prayer for Relief (Page 46)

## COUNT IV: 42 U.S.C. § 1983
### FOURTEENTH AMENDMENT:
### PROCEDURAL DECEPTION / FABRICATION OF EVIDENCE
(Against "Arredondo," in his Individual Capacity

and "Zepeda" in her Official Capacity.)

**Incorporation by Reference:**

134.   Plaintiff incorporates Paragraphs 4–8 (Parties) and Paragraphs 9–80 (Statement of Facts) as if fully set forth herein.

**Legal Standard:**

135.   The Fourteenth Amendment forbids state actors from procuring deprivation of a parent's custodial interests by knowingly presenting false evidence or deliberately omitting material exculpatory information in legal documents; a plaintiff states a procedural-deception and fabrication of evidence claim by alleging (1) a misrepresentation or omission, (2) made deliberately or with reckless disregard for the truth, that was (3) material to legal decisions. Ninth Circuit decisions recognize that deliberate fabrication, knowing falsehoods, or materially misleading omissions in dependency petitions or supporting materials can violate due process.

**Parties and Capacities:**

136.   Plaintiff STEVEN CAPRIO is the child's biological and adjudicated/legal father and a custodial caregiver. (See Parties ¶4; Facts ¶29–31.)

137.   "Arredondo," is sued in his individual capacity; he drafted, signed and filed the October 17, 2025 § 300 Petition under penalty of perjury and Detention Report and acted at the scene on October 15, 2025. (See Facts ¶11, 38.)

138.   "Zepeda" is sued in her official capacity as a final policymaker for CFS; discovery may further establish individual participation or ratification; she is "County" Director of Human Services and CFS, is a final policymaker for Human Services and CFS, and the October 17, 2025 Detention Report and related filings were submitted as "Respectfully Submitted by "Zepeda," indicating her supervisory involvement or ratification. She was provided exculpatory evidence by the Plaintiff that was omitted from the Report. (See Parties ¶5; Facts ¶38.)

**Particular Allegations:**

139.   On October 17, 2025, "Arredondo" signed and filed a Welfare & Institutions Code § 300 Petition, under penalty of perjury, and prepared and signed the Detention Report that was filed the same day; supervisor Sharon Gonzales also signed the Detention Report and the filing bears the notation "Respectfully Submitted by 'Zepeda'." (See Facts ¶38.)

140.   The Petition ("Petition") and Detention Report (filed Oct. 17, 2025) each contained materially false or misleading statements and omissions, including: (a) misclassifying Plaintiff as the child's "alleged father" despite the child's certified birth certificate and a March 1, 2010 Superior Court "County" judgment identifying Plaintiff as the legal parent; (b) asserting that the child's need for protection arose from parents' *"untreated mental-health"* and *"refusal to seek*

*mental-health treatment"* (Petition) while the Detention Report (filed same date) affirmatively states the parents were participating in therapy and Plaintiff had been in treatment for ADHD; (c) omitting exculpatory records and materials known to CFS and County Counsel, including protected March 2023 Child Assessment Center forensic interview materials released to Plaintiff by County Counsel, under WIC 827(a)(1)(D), on September 22, 2025; and (d) including pre-written *"prima facie"* court findings, placement decisions, and visitation/medical authorizations in the Detention Report dated October 17, 2025 that could not have been made at a hearing that had not yet occurred. (See Facts ¶¶29–31, 38–48, 56–59, 65.)

141.   The misstatements and omissions occurred in documents prepared  and signed by "Arredondo" and filed on October 17, 2025 (Petition and Detention Report). The Detention Report bears internal statements reflecting court findings and orders dated contemporaneously with the filing (Oct. 17, 2025) and references events and court findings and orders language, creating post-hoc removal and authority, without any court hearings that could not have been true when prepared. (See Facts ¶38, 41–48.)

142.   The material false statements and omissions were made in written documents, signed, and filed; becoming certified documents of the Superior Court of California "County" record. Materials prepared and intended to be presented as a legal basis for the removal (the Petition and the Detention Report), and in related CFS case files maintained by Defendants. (See Facts ¶38–48.)

143.   Plaintiff pleads specific facts supporting a reasonable inference that the false statements and omissions were made knowingly or with reckless disregard for the truth: (a) CFS and County Counsel possessed or had access to records (birth certificate, March 2010 judgment, and March 2023 CAC materials) establishing

Plaintiff's parentage and relevant exculpatory information before October 15–17, 2025 (Facts ¶29–31, 65); (b) County Counsel released protected CFS records to Plaintiff on September 22–23, 2025, placing CFS staff on notice of the materials in County Counsel's possession (Fact ¶65); (c) Plaintiff provided "Arredondo" additional incident materials and records on October 7 and other dates that were omitted from the October 17 filings (Fact ¶78); (d) Plaintiff provided "Zepeda" additional material information on October 9 and other dates that were omitted from the October 17 filings (Fact ¶76,79); the Detention Report was submitted under the supervisory notation "Respectfully Submitted by 'Zepeda'," reflecting "Zepeda's knowledge and ratification of materials that omitted or contradicted known exculpatory facts. Taken together, these facts plausibly show knowledge or reckless disregard for the truth in the Petition and Detention Report. (See Facts ¶29–31, 38, 65, 73–79.)

**Why the Misstatements and Omissions Were Material:**

144.   The misstatements and omissions were material because they directly related to the 10-day open referral, removal, and continued alleged authority, detention, and detention: (a) misclassification of parentage affected notice and rights; (b) the omission of exculpatory forensic materials and Plaintiff-supplied records created a materially misleading record of the investigative facts; and (c) the insertion of pre-written court findings and orders, "*prima facie findings,*" into the Detention Report created the appearance that the court had already reached findings justifying detention when no hearing had occurred. CFS used this to assert ongoing authority. Under controlling Ninth Circuit law, material misrepresentations or omissions in legal documents of record about matters central to the notice and detention inquiry are sufficient to state a due process claim.

**Specific Examples:**

145.   Misclassification of parentage. On October 17, 2025, "Arredondo" signed and filed a § 300 Petition that described Plaintiff as the child's "alleged father," despite CFS and County Counsel possessing "County" records that alreadfy adjudicated Plaintiff's parentage status (Facts ¶29–31, 65). This misclassification was material to the violations of the Plaintiff's rights. (See Facts ¶29–31.)

146.   Omission of March 2023 forensic materials. County Counsel emailed Plaintiff protected March 2023 Child Assessment Center forensic interview materials on September 23, 2025 (Fact ¶65); those materials reflected that certain statements attributed to the child originated with the mother and half-sister rather than from the child's own recollection, as the child stated in an earlier 2019 mediation report (Fact ¶68). Those materials were not included in the October 17, 2025 Petition or Detention Report despite being known or readily available to CFS and County Counsel, a fact that materially altered the factual predicate of exculpatory context. (See Facts ¶65.)

147. Contradictory mental-health statements. The § 300 Petition (signed Oct. 17 by "Arredondo") alleges the child's risk arose from the parents' *"untreated mental-health"* and *"refusal to seek treatment,"* while the Detention Report (signed Oct. 17 by "Arredondo" and authorized by "Zepeda") states both parents were participating in therapy and that Plaintiff had been in treatment and receiving ADHD care for years, contradictory assertions that could not both be true when made, but the Petition was used to create post-hoc justification for removal. (See Facts ¶39(a)–(c).)

148.   Pre-written court findings and orders. The Detention Report filed Oct. 17, 2025 includes *"prima facie"* findings, placement authorizations, medical examination authorizations, and visitation orders purporting that the court *"has*

*read and considered"* social-worker reports (including one dated Oct. 20, 2025) and that prima facie findings and placement decisions were established, language reflecting action, prior to any court hearing; the presence of these pre-written findings materially denied the Plaintiff and minor child, S.R.W-C., a voice. (See Facts ¶41–48.)

**Causation- How the Judicial Deception Caused the Constitutional Injury:**

149.   The Petition and Detention Report were the operative documents CFS filed to become documents of record to justify detention and other interim orders; The deliberate omissions of exculpatory forensic materials, the misclassification of Plaintiff's parentage, the insertion of mutually inconsistent factual allegations, and the inclusion of pre-written judicial findings and placement directives foreseeably and proximately were used to proceed with detention, placement, and related orders without meaningful input from Plaintiff, or his child, thereby causing the deprivation of Plaintiff's custody and the stigmatizing CACI listing. Ninth Circuit cases hold that such omissions and fabrications are causally linked to constitutional injury where they were material to the deprivation of rights.

**Plausibility and Particularity:**

150.   Plaintiff pleads with particularity the identity of the named Defendants' as authors and signatories "Arredondo" and "Zepeda", the dates of the relevant conduct, including but not limited to, September 18, 2025 - October 17, 2025, (ongoing, as well as previously to 2015) however the specific false or omitted content (misclassification as "alleged father," omission of March 2023 forensic materials, contradictory mental-health statements, pre-written court findings), the place of presentation (State "County" records, and CFS case files), the manner of presentation (signed Petition and Detention Report filed with the county clerk, and the materiality and foreseeable causal effect of unlawful authority. These

allegations satisfy Rule 9(b) particularity for claims of judicial deception and fabrication recognized by the Ninth Circuit.

**Official Capacity / Ratification:**

151.   Plaintiff pleads that "Zepeda" had actual knowledge of the underlying records and communications (including County Counsel releases and correspondence with Plaintiff on, but not limited to, September 30 and October 9, 2025), exercised supervisory authority over detention reports and filings, and ratified the October 17, 2025 Detention Report by submitting or approving it under the notation "Respectfully Submitted by "Zepeda." Those facts plausibly allege that "Zepeda" approved the the removal and adopted materially deficient filings and therefore may be liable in her official capacity and, to the extent the record supports, in her individual capacity for participation or ratification sufficient to meet Ninth Circuit supervisory/ratification standards.

**Damages and Remedies Sought:**

152.   As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiff was deprived of his custodial relationship with his child, suffered emotional distress, reputational injury, and other damages. Plaintiff seeks damages against individual defendants, declaratory relief that Defendants' actions violated the Fourteenth Amendment, including correction/expungement of the CACI listing, attorneys' fees, and whatever else the Court deems appropriate under 42 U.S.C. § 1988.

**Qualified Immunity:**

153.   Qualified immunity does not bar relief on this claim because Ninth Circuit precedent clearly established before October 15-17, 2025 that social workers and other state actors violate the Constitution when they knowingly use false evidence

or deliberately omit material exculpatory information to procure orders that deprive parents of custody; when social workers so act, they are not entitled to qualified immunity. The Ninth Circuit has repeatedly held that the right to be free from deception/fabrication to obtain legal standing was clearly established, and that social workers may be liable where filings contained false statements or deliberate omissions material to deprivation of the parents rights.

**Prayer for Relief:**

154.   Plaintiff seeks relief as set forth in the Prayer for Relief (Page 46)

**COUNT V: 42 U.S.C. § 1983**

**MUNICIPAL LIABILITY (MONELL)**

(Against "County" under *Monell*)

**Incorporation:**

155.   Plaintiff incorporates by reference Paragraphs 4–80 of the Statement of Facts and all preceding allegations of this Complaint as if fully set forth herein.

**Parties:**

156.   Defendant SAN BERNARDINO COUNTY "County" is the municipal entity that operates Children & Family Services (CFS) and is sued under *Monell v. Dep't of Soc. Servs.* for policies, customs, practices, failures to train and supervise, and ratification by final policymakers that caused the constitutional violations alleged herein. Plaintiff pleads official-capacity claims to establish policymaker ratification and municipal liability, not to impose respondeat superior liability.

**Overview / Monell Theories:**

157.   This Count alleges municipal liability under *Monell* by pleading one or

more of the following alternative, non-exclusive theories: (a) an official, written or unwritten policy or practice of the County that caused constitutional injury; (b) a longstanding custom or practice so widespread as to have the force of law; (c) a failure to train, supervise, or discipline County social workers amounting to deliberate indifference to constitutional rights; and (d) ratification by a final policymaker ("Zepeda") of the unconstitutional practices or of the specific actions that deprived Plaintiff of his federal rights. *Monell v. Dep't of Soc. Servs.*; *City of Canton v. Harris*; Ninth Circuit Model Instruction 9.8 and 9.6.

**Final Policymaker / Ratification:**

158.   "Zepeda" is the Director of Human Services and Children & Family Services for "County" and, as alleged in the Parties section, exercised final policymaking authority for CFS concerning policies, detention reports, removal procedures, training, and supervision. (See Parties ¶5.) Under Ninth Circuit law, an act of a final policymaker that causes a constitutional deprivation may be attributed to the municipality. Ninth Circuit model instruction 9.6; *Monell.*

159.   Plaintiff pleads specific facts showing that "Zepeda" (a) communicated with Plaintiff about the September/October referrals and the March 2023 forensic materials, etc; (b) received repeated correspondence and requests for executive-level oversight (collectively identified in Exhibit F); and (c) approved or caused to be submitted the Detention Report and related filings reflected as "Respectfully Submitted by 'Zepeda,'" which ratified or adopted the operative filings and placement actions submitted as part of the detention and placement process on October 17, 2025. These allegations plausibly plead that "Zepeda" acted as a final policymaker whose actions and ratification were the moving force behind the deprivation. See Model Jury Instruction 9.6; Praprotnik / Pembaur principles as applied by the Ninth Circuit.

**Policy / Written or Unwritten Practices:**

160.   Plaintiff pleads that the "County" maintained a policy, practice or pattern including but not limited to: (a) removals or detentions to proceed without meaningful antecedent notice to identified legal and custodial parents during or after open referrals; (b) use and filing of detention/petition materials that omit exculpatory records and insert pre-written findings and orders; and (c) placement of parents on the Child Abuse Central Index (CACI) without constitutionally adequate grievance instructions or meaningful administrative challenge. The "County's" public CFS webpages and practice materials and the CDSS Manual demonstrate the existence of discrete procedural requirements which the "County" systematically failed to follow (e.g., intake, investigation, and detention documentation protocols). Those systemic departures from mandated procedures plausibly plead municipal policy and practice. (See CDSS Manual and San Bernardino CFS materials.)

**Customs / Widespread Practices:**

161.   Plaintiff pleads a pattern, practice, or custom of comparable departures from required intake, notice, and documentation procedures occurring across time (2023–2025), including repeated closed or improperly handled referrals, repeated communications to CFS leadership warning of procedural irregularities, repeated unsuccessful attempts by Plaintiff to secure executive oversight, complaints regarding "Zepeda" and misconduct to her supervisor, Diane Rundles, AEO, for the "County" (Facts ¶76) with no repsonse, and other events reflected in the Oversight History document attached hereto (Exhibit F.) These allegations plead a widespread or persistent practice sufficient to state a custom or practice claim under *Monell*. Ninth Circuit precedent recognizes that a pattern of similar violations (or the municipality's deliberate indifference to them) supports *Monell* liability. See *Scanlon; Mann/Benavidez*; model instruction 9.5/9.8.

**Failure to Train / Supervise:**

162.  The "County" failed to train and supervise CFS social workers and supervisors regarding (a) constitutional limits on warrantless child removals and the required scope and content of pre-seizure communications and documentation; (b) the necessity of preserving and presenting exculpatory materials to parents and documents of record; and (c) the proper procedures for CACI listings and grievance process. Under *City of Canton v. Harris* and Ninth Circuit guidance, a municipality may be liable where such failures amount to deliberate indifference to the constitutional rights of persons in the county's charge. The Complaint pleads facts showing the obviousness of the need for training (e.g., pattern of closed referrals without parent contact, inconsistent detention filings, pre-written court findings, inadequate CACI notices, child removal), which put policymakers on notice that training and supervision were inadequate and likely to cause the precise constitutional injuries alleged. Ninth Circuit model instruction 9.8; *City of Canton; Clouthier*.

**Deliberate Indifference and Single-Incident Exception:**

163.  Plaintiff pleads that the "County" was on actual and constructive notice of recurring procedural failures and had repeated communications and records (Exhibit F) that should have prompted corrective policy, training, or supervision; the "County's" retention of those practices despite notice demonstrates deliberate indifference under *Monell* and *City of Canton*. In the alternative, the Complaint alleges facts showing the "County's" failures were so obviously likely to result in constitutional violations that the single-incident exception applies. Even absent a pattern, the need to train social workers on the constitutional limits of warrantless child removal is so obvious that failure to do so predictably results in constitutional violations. (e.g., failure to train social workers about when judicial authorization is required before seizure), consistent with Ninth Circuit precedent (e.g., *Castro*

/ *Sandoval* line applying a narrow single-incident exception where training omissions are obvious).

**Linking Municipal Policy/Practice to the Constitutional Violations:**

164.  Plaintiff pleads direct causation between "County" policies/practices and the constitutional deprivations: (a) the "County's" practices permitted or encouraged Arredondo to effect removal without prior notice or meaningful parental participation; (b) the County's documentation practices allowed post-seizure filings that omitted exculpatory records and contained pre-written findings; (c) the County's grievance and CACI procedures denied a meaningful opportunity to challenge stigmatizing listings; and (d) "Zepeda's" supervisory actions and ratification of the October filings show the final policymaker's role in adopting or tolerating the challenged practices. These allegations trace the injuries to municipal action such that the County's policy/custom/failure to train was the moving force behind the deprivation. *Monell*; Ninth Circuit pattern/cause jurisprudence.

**Examples and Factual Particulars:**

165.  Representative facts supporting *Monell* liability include, without limitation:

- the Oversight History showing repeated referrals, closed/refused reopenings, and multiple communications to "Zepeda" and other senior CFS leaders raising procedural concerns; (Exhibit F.)
- agency conduct on September/October 2025: failure to contact Plaintiff during the 10-Day referral that expired, failure to provide antecedent notice of contemplated detention, removal on October 15, 2025 without a communicated judicial order or articulated exigency, and post-seizure filings on October 17, 2025 containing contradictory and pre-written findings; (See Statement of Facts ¶¶60–80; ¶¶17–25; ¶38–49.)

- CACI notice practices that furnished defective grievance instructions and an improper mailing/appeal address, depriving Plaintiff of a meaningful process to contest a stigmatizing listing. (See Facts ¶33–37; *Humphries*).

**Qualified Immunity ("County"):**

166.   Municipal entities are not entitled to qualified immunity, and *Monell* liability may attach where "County" policymakers caused or ratified unconstitutional practices; moreover, the Complaint pleads facts supporting that the "County" and final policymakers had actual knowledge of the pattern of procedural failures and nevertheless failed to correct them, establishing deliberate indifference and precluding a defense based on reasonable reliance or lack of notice at the pleading stage. *Monell*; *City of Canton*; Ninth Circuit precedent (*Scanlon; Mann/Benavidez; Rieman*).

**Prayer for Relief:**

167.   Plaintiff seeks relief as set forth in the Prayer for Relief (Page 46)

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff STEVEN RYAN CAPRIO respectfully requests that judgment be entered in his favor and against Defendants, and that the Court grant the following relief:

1.     **Declaratory Relief:** A declaration pursuant to 28 U.S.C. § 2201 that Defendants' acts, omissions, policies, customs, and practices, as alleged herein, violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

2.    **Compensatory Damages:** An award of compensatory damages against the individual Defendants, jointly and severally, in an amount to be determined at trial, for emotional distress, loss of familial association, reputational harm, and other injuries proximately caused by Defendants' conduct.

3.    **Nominal Damages:** An award of nominal damages for the violation of Plaintiff's constitutional rights.

4.    **Punitive Damages (Individual Defendants Only):** An award of punitive damages against "Arredondo", and any other individual Defendant proven at Jury trial to have acted with reckless or callous indifference to Plaintiff's constitutional rights, in an amount sufficient to punish and deter similar misconduct.

5.    **Equitable Relief:** Such equitable and prospective relief as the Court deems just and proper to remedy ongoing or future constitutional violations, including correction of official records, if warranted by the evidence.

6.    **Injunctive Relief:** Such equitable and prospective relief as the Court deems just and proper to remedy ongoing or future constitutional violations, including correction of official records, if warranted by the evidence.

7.    **Costs and Attorneys' Fees:** An award of costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable law.

8.    **Interest:** Pre-judgment and post-judgment interest as allowed by law.

9.    **Jury Trial:** Trial by jury on all issues so triable.

10.    **Further Relief:** Such other and further relief as the Court deems just and proper.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury on all triable issues.

## RESERVATION OF RIGHT TO AMEND

Plaintiff reserves all rights afforded under Federal Rule of Civil Procedure 15 to amend or supplement this Complaint, including to assert additional claims or identify additional parties, should discovery, motion practice, or other developments so warrant.

Dated: _____12/24/25_____                     Respectfully submitted,

_____

STEVEN CAPRIO (Plaintiff, pro se)